**GOMEZ TRIAL ATTORNEYS**
John H. Gomez (SBN 171485)
John P. Fiske (SBN 249256)
655 West Broadway, Suite 1700
San Diego, CA 92101
Telephone:  619.237.3490/Fax:  619.237.3496

**BARON & BUDD, P.C.**
Scott Summy *(pending Pro Hac Vice)*
(Texas Bar No. 19507500)
Carla Burke *(pending Pro Hac Vice)*
(Texas Bar No. 24012490)
Celeste Evangelisti (SBN 225232)
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219-4281
Telephone: 214-521-3605/Fax:

**OFFICE OF THE CITY ATTORNEY**
**City of San Jose**
Richard Doyle (SBN 88625)
Nora Frimann (SBN 93249)
200 E Santa Clara St
San Jose, CA 95113-1905
Telephone: (408) 535-1950/ Fax: (408) 998-3131

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA- SAN JOSE DIVISION

| | |
|---|---|
| CITY OF SAN JOSE, a municipal corporation;<br><br>Plaintiff,<br><br>v.<br><br>MONSANTO COMPANY,<br>SOLUTIA INC., and<br>PHARMACIA CORPORATION, and DOES 1<br>through 100,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. _____<br><br>**PLAINTIFF'S ORIGINAL<br>COMPLAINT** |

I.      **INTRODUCTION**

1.      Polychlorinated biphenyls (or "PCBs") are man-made chemical compounds that have become notorious as global environmental contaminants — found in bays, oceans, rivers, streams, soil, and air.  As a result, PCBs have been detected in the tissues of all living beings on earth including all

1

forms of marine life, various animals and birds, plants and trees, and humans.

2.     The extent of PCB contamination is troubling because PCBs cause a variety of adverse health effects.  In humans, PCB exposure is associated with cancer as well as serious non-cancer health effects, including effects on the immune system, reproductive system, nervous system, endocrine system and other health effects.  In addition, PCBs destroy populations of fish, birds, and other animal life.

3.     Monsanto Company was the sole manufacturer of PCBs in the United States from 1935 to 1979, and trademarked the name "Aroclor" for certain PCB compounds.  Although Monsanto knew for decades that PCBs were toxic and knew that they were widely contaminating all natural resources and living organisms, Monsanto concealed these facts and continued producing PCBs until Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of PCBs as of January 1, 1979.

4.     U.S. EPA (2000b) has classified PCBs as 'probably human carcinogens.' Studies have suggested that PCBs may play a role in inducing breast cancer. Studies have also linked PCBs to increased risk for several other cancers including liver, biliary tract, gall bladder, gastrointestinal tract, pancreas, melanoma, and non-Hodgkin's lymphoma. PCBs may also cause non-carcinogenic effects, including reproductive effects and developmental effects (primarily to the nervous system).  PCBs tend to accumulate in the human body in the liver, adipose tissue (fat), skin, and breast milk.  PCBs have also been found in human plasma, follicular fluid, and sperm fluid.  Fetuses may be exposed to PCBs in utero, and babies may be exposed to PCBs during breastfeeding.  According to U.S. EPA (2000b), '[s]ome human studies have also suggested that PCB exposure may cause adverse effects in children and developing fetuses while other studies have not shown effects.  Reported effects include lower IQ scores, low birth weight, and lower behavior assessment scores.

5.     PCBs have traveled into San Francisco Bay by a variety of ways.  PCBs were used in many industrial and commercial applications such as paint, caulking, transformers, capacitors, coolants, hydraulic fluids, plasticizers, sealants, inks, lubricants, and other uses.  PCBs regularly leach, leak, off-gas, and escape their intended applications, causing runoff during naturally occurring storm and rain events, after being released into the environment.  The runoff originates from multiple sources

1    and industries and enters the Bay with stormwater and other runoff.

2        6.    The natural fate and transport of PCBs result in the gathering and collection in

3    stormwater through no fault of the City of San Jose, which lawfully discharges water into San

4    Francisco Bay through its NPDES permit.

5        7.    San Francisco Bay ("the Bay") is contaminated with PCBs, which have been detected in

6    the Bay's water, sediments, fish, and wildlife.  All segments of the Bay have been identified as

7    impaired due to elevated levels of PCBs in sport fish.[1]  The U.S. Environmental Protection Agency

8    ("U.S. EPA") has approved a PCB Total Maximum Daily Load ("TMDL") for the Bay.

9        8.    A Total Maximum Daily Load, or TMDL, is a calculation of the maximum amount of

10   pollutant that an impaired body of water can receive and still safely meet water quality standards.[2]

11       9.    The San Francisco Bay is impaired due to the presence of PCBs.

12       10.   The TMDL is intended to achieve protection of the commercial sport fishing beneficial

13   use and to the extent that other beneficial uses are affected by PCBs, the TMDL will also ensure

14   protection of other beneficial uses, specifically, preservation of rare and endangered species, estuarine

15   habitat and wildlife habitat.[3]

16       Plaintiff CITY OF SAN JOSE hereby alleges, upon information and belief, as follows:

17   **II.    PARTIES**

18       11.   The CITY OF SAN JOSE ("San Jose" or "Plaintiff") is a California Charter City and

19   municipal corporation, duly organized and existing by virtue of the laws of the State of California.

20       12.   Plaintiff brings this suit pursuant to California Code of Civil Procedure 731, and

21   California Civil Code sections 3479, 3480, 3491, 3493, and 3494 and any other applicable codes or

22   forms of relief available for monetary damages and removal of the public nuisance caused by PCBs in

23   the Bay.

24   _____

25   [1] San Francisco Bay Regional Water Quality Control Board, California Environmental Protection
     Agency,

26   ww.waterboards.ca.gov/sanfranciscobay/water_issues/programs/planningtmdls/basinplan/web/bp_ch7
     b.shtml#7.2.3.

27   [2] United States Environmental Protection Agency,
     www.water.epa.gov/lawsregs/lawsguidance/cwa/tmdl/

28   [3] *Id.*

13.     Plaintiff manages and operates a municipal stormwater system, which collects and transports stormwater to be discharged into the Bay.  In order to discharge stormwater into the Bay, Plaintiff is required to receive a Municipal Regional Stormwater Permit from the San Francisco Bay Regional Water Quality Control Board, pursuant to the National Pollutant Discharge Elimination System under the Clean Water Act.

14.     Plaintiff is a permittee under a Municipal Regional Stormwater Permit, which includes a TMDL for PCBs, as the Bay is impaired due to PCBs.

15.     Therefore, Plaintiff is subject to a PCB TMDL under a Municipal Regional Stormwater Permit. The PCB TMDL requires Plaintiff to limit its stormwater discharge of PCBs into the Bay.

16.     Thus, Plaintiff has spent money in efforts to reduce PCB discharge toward these state-mandated TMDL goals.

17.     Recently, the San Francisco Bay Regional Water Quality Control Board increased the standards for the PCB TMDL, which now requires the Plaintiff to further limit its PCB discharge into the  Bay.

18.     On May 11, 2015, a new draft Municipal Regional Stormwater Permit, to govern the next permit period, became the Tentative Order, requiring stricter standards and further, significant reduction in PCB discharge into the Bay.[4]

19.     The new, stricter TMDL requirements will cost Plaintiff additional money in order to improve procedures, methods, and facilities, in order to reduce PCB discharge to new and future TMDL levels.

20.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its principal place of business in St. Louis, Missouri.

21.     Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

22.     Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor

---

[4] California Regional Water Quality Control Board, San Francisco Bay Region, Municipal Regional Stormwater NPDES Permit, Order R2-2015-XXX, NPDES Permit No. CAS612008.

GOMEZ
TRIAL ATTORNEYS

to the original Monsanto Company) is a Delaware LLC with its principal place of business in Peapack, New Jersey.  Pharmacia is now a wholly-owned subsidiary of Pfizer, Inc.

23.     The original Monsanto Company ("Old Monsanto") operated an agricultural products business, a pharmaceutical and nutrition business, and a chemical products business.  Old Monsanto began manufacturing PCBs in the 1930s and continued to manufacture commercial PCBs until the late 1970s.

24.     Through a series of transactions beginning in approximately 1997, Old Monsanto's businesses were spun off to form three separate corporations.  The corporation now known as Monsanto operates Old Monsanto's agricultural products business.  Old Monsanto's chemical products business is now operated by Solutia.  Old Monsanto's pharmaceuticals business is now operated by Pharmacia.

25.     Solutia was organized by Old Monsanto to own and operate its chemical manufacturing business.  Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemicals business.[5]

26.     Although Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto Company) for certain liabilities related to the chemicals business, Defendants have entered into agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims arising from Old Monsanto's chemical business --- including the manufacture and sale of PCBs.[6]

27.     In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code.  Solutia's reorganization was completed in 2008.  In connection with Solutia's Plan of Reorganization, Solutia, Pharmacia and New Monsanto entered into several agreements under which Monsanto continues to manage and assume financial responsibility for certain tort litigation and

---

[5] See MONSANTO COMPANY'S ANSWER TO THE COMPLAINT AND JURY DEMAND, *Town of Lexington v. Pharmacia Corp., Solutia, Inc., and Monsanto Company*, C.A. No. 12-CV-11645, D. Mass. (October 8, 2013);  see also Relationships Among Monsanto Company, Pharmacia Corporation, Pfizer Inc., and Solutia Inc., http://www.monsanto.com/whoweare/pages/monsanto-relationships-pfizer-solutia.aspx (last accessed February 20, 2014).
[6] *See id.*

PLAINTIFF'S ORIGINAL COMPLAINT

1   environmental remediation related to the Chemicals Business.[7]

2        28.     Monsanto, Solutia, and Pharmacia are collectively referred to in this Complaint as

3   "Defendants."

4   **III.    JURISDICTION AND VENUE**

5        29.     This Court has jurisdiction pursuant to 28 U.S.C. §1332 because complete diversity

6   exists between Plaintiff and Defendants.  The Plaintiff is located in California, but no Defendant is a

7   citizen of California.  Monsanto is a Delaware corporation with its principal place of business in St.

8   Louis, Missouri.  Solutia is a Delaware corporation with its principal place of business in St. Louis,

9   Missouri.  Pharmacia is a Delaware limited liability company with its principal place of business in

10  Peapack, New Jersey.

11       30.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. section 1391(a)

12  because a substantial part of the property that is the subject of the action is situated in this judicial

13  district.

14  **IV.    FACTUAL ALLEGATIONS**

15       **A.     PCBs are Toxic Chemicals that Cause Environmental Contamination.**

16       31.     Polychlorinated biphenyl, or "PCB," is a molecule comprised of chlorine atoms

17  attached to a double carbon-hydrogen ring (a "biphenyl" ring).  A "PCB congener" is any single,

18  unique chemical compound in the PCB category.  Over two hundred congeners have been identified.[8]

19       32.     PCBs were generally manufactured as mixtures of congeners.  From approximately

20  1935 to 1979, Monsanto Company was the only manufacturer in the United States that intentionally

21  produced PCBs for commercial use.[9]  The most common trade name for PCBs in the United States was

22  "Aroclor," which was trademarked by Old Monsanto.

23

24  [7] *See* Monsanto's Form 8-K (March 24, 2008), and Form 10-Q (June 27, 2008), available at
    http://www.monsanto.com/investors/pages/sec-filings.aspx (last accessed February 20, 2014).

25  [8] Table of PCB Congeners, available at

26  http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/congeners.htm (last accessed February 20, 2014).

27  [9] *See* 116 Cong. Record 11695, 91st Congress, (April 14, 1970) ("Insofar as the Monsanto Co., the sole manufacturer of PCB's is concerned . . . ."); 121 Cong. Record 33879, 94th Congress, (October 23,

28  1975) ("The sole U.S. producer, Monsanto Co. . . . .").  *See also* MONS 058730-058752 at 058733 (identifying other producers as "all ex-USA."), attached as Exhibit A.

GOMEZ
TRIAL ATTORNEYS

33.     Monsanto's commercially-produced PCBs were used in a wide range of industrial applications in the United States including electrical equipment such as transformers, motor start capacitors, and lighting ballasts.  In addition, PCBs were incorporated into a variety of products such as caulks, paints, and sealants.

34.     As used in this Complaint, the terms "PCB," "PCBs," "PCB-containing products," and "PCB products" refer to products containing polychlorinated biphenyl congener(s) manufactured for placement into trade or commerce, including any product that forms a component part of or that is subsequently incorporated into another product.

35.     PCBs easily migrate out of their original source material or enclosure and contaminate nearby surfaces, air, water, soil, and other materials.  For example, PCB compounds volatilize out of building materials (such as caulk) into surrounding materials such as masonry, wood, drywall, and soil, thereby causing damage to those surrounding materials.  PCBs can also escape from totally-enclosed materials (such as light ballasts) and similarly contaminate and damage surrounding materials.

36.     PCBs present serious risks to the health of humans, wildlife, and the environment.

37.     Humans may be exposed to PCBs through ingestion, inhalation, and dermal contact. Individuals may inhale PCBs that are emitted into the air.  They may also ingest PCBs that are emitted into air and settle onto surfaces that come into contact with food or drinks.  And they may absorb PCBs from physical contact with PCBs or PCB-containing materials.

38.     EPA has determined that Monsanto's PCBs are probable human carcinogens.  In 1996, EPA reassessed PCB carcinogenicity, based on data related to Aroclors 1016, 1242, 1254, and 1260.[10] EPA's cancer reassessment was peer reviewed by 15 experts on PCBs, including scientists from government, academia and industry, all of whom agreed that PCBs are probable human carcinogens.

39.     In addition, EPA concluded that PCBs are associated with serious non-cancer health effects.  From extensive studies of animals and primates using environmentally relevant doses, EPA has found evidence that PCBs exert significant toxic effects, including effects on the immune system,

---

[10] EPA, PCBs: Cancer Dose-Response Assessment and Application to Environmental Mixtures, EPA/600/P-96/001F (September 1996), available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/pcb.pdf (last accessed May 5, 2014).

GOMEZ TRIAL ATTORNEYS

the reproductive system, the nervous system, and the endocrine system.

40. PCBs affect the immune system by causing a significant decrease in the size of the thymus gland, lowered immune response, and decreased resistance to viruses and other infections. The animal studies were not able to identify a level of PCB exposure that did not affect the immune system. Human studies confirmed immune system suppression.

41. Studies of reproductive effects in human populations exposed to PCBs show decreased birth weight and a significant decrease in gestational age with increasing exposures to PCBs. Animal studies have shown that PCB exposures reduce birth weight, conception rates, live birth rates, and reduced sperm counts.

42. Human and animal studies confirm that PCB exposure causes persistent and significant deficits in neurological development, affecting visual recognition, short-term memory, and learning. Some of these studies were conducted using the types of PCBs most commonly found in human breast milk.

43. PCBs may also disrupt the normal function of the endocrine system. PCBs have been shown to affect thyroid hormone levels in both animals and humans. In animals, decreased thyroid hormone levels have resulted in developmental deficits, including deficits in hearing. PCB exposures have also been associated with changes in thyroid hormone levels in infants in studies conducted in the Netherlands and Japan.

44. PCBs have been associated with other health effects including elevated blood pressure, serum triglyceride, and serum cholesterol in humans; dermal and ocular effects in monkeys and humans; and liver toxicity in rodents.

45. Children may be affected to a greater extent than adults. The Agency for Toxic Substances and Disease Registry explained: "Younger children may be particularly vulnerable to PCBs because, compared to adults, they are growing more rapidly and generally have lower and distinct profiles of biotransformation enzymes, as well as much smaller fat deposits for sequestering

the lipophilic PCBs."[11]

46.    PCBs are known to be toxic to a number of aquatic species and wildlife including fish, marine mammals, reptiles, amphibians, and birds.  Exposure is associated with death, compromised immune system function, adverse effects on reproduction, development, and endocrine function.  PCB exposure affects liver function, the digestive system, and nervous systems and can promote cancer in a number of animal species.  The presence of PCBs can cause changes in community and ecosystem structure and function.[12]

**B.    Monsanto Has Long Known of PCBs' Toxicity.**

47.    Monsanto was well aware of scientific literature published in the 1930s that established that inhalation in industrial settings resulted in toxic systemic effects. [13]

48.    An October 11, 1937, Monsanto memorandum advises that "Experimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects.  Repeated bodily contact with the liquid Aroclors may lead to an acne-form skin eruption."[14]

49.    A September 20, 1955, memo from Emmet Kelly set out Monsanto's position with respect to PCB toxicity:  "We know Aroclors are toxic but the actual limit has not been precisely defined.  It does not make too much difference, it seems to me, because our main worry is what will happen if an individual develops [*sic*] any type of liver disease and gives a history of Aroclor exposure. I am sure the juries would not pay a great deal of attention to [maximum allowable concentrates]."[15]

50.    On November 14, 1955, Monsanto's Medical Department provided an opinion that workers should not be allowed to eat lunch in the Aroclor department:

---

[11] Agency for Toxic Substances and Disease Registry, Toxicological Profile for Polychlorinated Biphenyls (PCBs), (November 2000), at 405, available at www.atsdr.cdc.gov (last accessed May 1, 2014).
[12] *See* EPA, Understanding PCB Risks, available at http://www.epa.gov/housatonic/understandingpcbrisks.html#WildlifeEcologicalRiskAssessment (last accessed March 5, 2015).
[13] See Exhibits B, C, F
[14] MONS 061332, attached as Exhibit B.
[15] MONS 095196-7, attached as Exhibit C.

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT

It has long been the opinion of the Medical Department that eating in process departments is a potentially hazardous procedure that could lead to serious difficulties.  While the Aroclors are not particularly hazardous from our own experience, this is a difficult problem to define because early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation.[16]

51.     On January 21, 1957, Emmet Kelly reported that after conducting its own tests, the U.S. Navy decided against using Monsanto's Aroclors:  "No matter how we discussed the situation, it was impossible to change their thinking that Pydraul 150 is just too toxic for use in a submarine."[17]

52.     In 1966, Kelly reviewed a presentation by Swedish researcher Soren Jensen, who stated that PCBs "appeared to be the most injurious chlorinated compounds of all tested."[18]  Jensen refers to a 1939 study associating PCBs with the deaths of three young workers and concluding that "pregnant women and persons who have at any time had any liver disease are particularly susceptible."[19]  Kelly does not dispute any of Jensen's remarks, noting only, "As far as the section on toxicology is concerned, it is true that chloracne and liver trouble can result from large doses."[20]

**C.    Monsanto Has Long Known that PCBs Were "Global Contaminants" Causing Harm to Animals and Fish.**

53.     At the same time, Monsanto became aware that PCBs were causing widespread contamination of the environment, far beyond the areas of its use.[21]

54.     Monsanto's Medical Director reviewed an article by Swedish researcher Soren Jensen, who reported the detection of PCBs in the tissues of fish and wildlife in Sweden.[22]  The report noted that PCBs were also detected in the air over London and Hamburg and found in seals caught off the

---

[16] Monsanto Chemical Company, Memorandum to H.B. Patrick, November 14, 1955 (no Bates number), attached as Exhibit D.
[17] MONS 095640, attached as Exhibit E.
[18] *See* JDGFOX00000037-63, attached as Exhibit F.
[19] *Id*. at JDGFOX00000039.
[20] *Id*. at JDGFOX00000037.
[21] See Exhibits G, H, L,
[22] New Scientist (December 15, 1986), MONSFOX00003427, attached as Exhibit G.

10

GOMEZ
TRIAL ATTORNEYS

1  coast of Scotland.  Jensen concluded that PCBs can "be presumed to be widespread throughout the

2  world."[23]

3       55.     A December 1968 article by Richard Risebrough identified chlorinated hydrocarbons

4  (which include PCBs) as "the most abundant synthetic pollutants present in the global environment."[24]

5  The article reported finding significant concentrations of PCBs in the bodies and eggs of peregrine

6  falcons and 34 other bird species.  The report linked PCBs to the rapid decline in peregrine falcon

7  populations in the United States.

8       56.     Despite growing evidence of PCBs' infiltration of every level of the global ecology,

9  Monsanto remained steadfast in its production of Aroclors and other PCBs.

10       57.     On March 6, 1969, Monsanto employee W. M. Richard wrote a memorandum

11  discussing Risebrough's article that criticized PCBs as a "toxic substance", "widely spread by air-

12  water; therefore, an uncontrollable pollutant . . .  causing extinction of peregrine falcon … [and]

13  endangering man himself."[25]  Richard explained that Monsanto could take steps to reduce PCB

14  releases from its own plants but cautioned, "It will be still more difficult to control other end uses such

15  as cutting oils, adhesives, plastics, and NCR paper.  In this applications exposure to consumers is

16  greater and the disposal problem becomes complex."[26]

17       58.     On September 9, 1969, Monsanto employee W.R. Richard wrote an interoffice memo

18  titled "Defense of Aroclor."[27]  He acknowledged the role of Aroclor in water pollution:  "Aroclor

19  product is refractive, will settle out on solids – sewerage sludge – river bottoms, and apparently has a

20  long life."  He noted that Aroclors 1254 and 1260 had been found along the Gulf Coast of Florida

21  causing a problem with shrimp;  in San Francisco Bay, where it was reported to thin egg shells in

22  birds; and in the Great Lakes.  Richard advised that the company could not defend itself against all

23  criticism:  "We can't defend vs. everything.  Some animals or fish or insects will be harmed.  Aroclor

24

25  [23] *Id.*

26  [24] R.W. Risebrough, Polychlorinated Biphenls in the Global Ecosystem, Nature, Vol. 220 (December 14, 1968), attached as Exhibit H.

27  [25] MONS 096509-096511, attached as Exhibit I.

   [26] *Id.*

28  [27] DSW 014256-014263, attached as Exhibit J.

PLAINTIFF'S ORIGINAL COMPLAINT

degradation rate will be slow. Tough to defend against. Higher chlorination compounds will be worse [than] lower chlorine compounds. Therefore we will have to restrict uses and clean-up as much as we can, starting immediately."[28]

59.     On January 29, 1970, Elmer Wheeler of the Medical Department circulated laboratory reports discussing results of animal studies. He noted: "Our interpretation is that the PCB's are exhibiting a greater degree of toxicity in this chronic study than we had anticipated. Secondly, although there are variations depending on species of animals, the PCB's are about the same as DDT in mammals."[29]

60.     Monsanto expressed a desire to keep profiting from PCBs despite the environmental havoc in a PCB Presentation to Corporate Development Committee. The report suggests possible reactions to the contamination issue. It considered that doing nothing was "unacceptable from a legal, moral, and customer public relations and company policy viewpoint." But the option of going out of the Aroclor business was also considered unacceptable: "there is too much customer/market need and selfishly too much Monsanto profit to go out."[30]

61.     The Aroclor Ad Hoc Committee held its first meeting on September 5, 1969. The committee's objectives were to continue sales and profits of Aroclors in light of the fact that PCB "may be a global contaminant."[31] The meeting minutes acknowledge that PCB has been found in fish, oysters, shrimp, birds, along coastlines of industrialized areas such as Great Britain, Sweden, Rhine River, low countries, Lake Michigan, Pensacola Bay, and in Western wildlife. Moreover, the committee implicated the normal use of PCB-containing products as the cause of the problem: "In one application alone (highway paints), one million lbs/year are used. Through abrasion and leaching we can assume that nearly all of this Aroclor winds up in the environment."[32]

62.     A month later, on October 2, 1969, the Committee reported extensive environmental contamination. The U.S. Department of Interior, Fish and Wildlife found PCB residues in dead eagles

---

[28] *Id.*
[29] MONS 098480, attached as Exhibit K.
[30] Ex. A at 058737.
[31] MONS 030483-030486, attached as Exhibit L.
[32] *Id.*at 030485.

PLAINTIFF'S ORIGINAL COMPLAINT

1    and marine birds.  Similarly, the Bureau of Commercial Fisheries reported finding PCBs in the river

2    below Monsanto's Pensacola plant.   The U.S. Food and Drug Administration had discovered PCBs in

3    milk supplies.  The Committee advised that Monsanto could not protect the environment from

4    Aroclors as "global" contaminants but could protect the continued manufacture and sale of Aroclors:

5           There is little probability that any action that can be taken will prevent the
            growing incrimination of specific polychlorinated biphenyls (the higher
6           chlorinated – e.g. Aroclors 1254 and 1260) as nearly <u>global environmental
            contaminants</u> leading to <u>contamination of human food</u> (particularly fish), the
7           <u>killing of some marine species</u> (shrimp), and the possible extinction of several
            species of fish eating birds.
8           Secondly, the committee believes that there is no practical course of action
            that can so effectively police the uses of these products as to prevent
9           environmental contamination.  <u>There are, however a number of actions</u> which
            must be undertaken <u>to prolong the manufacture, sale and use of these
10          particular Aroclors</u> as well as to protect the continued use of other members of
            the Aroclor series.[33]

11

12          63.       Monsanto's desire to protect Aroclor sales rather than the environment is reflected in

13   the Committee's stated objectives:

14

15          1.     Protect continues sales and profits of Aroclors;
            2.     Permit continued development of new uses and sales, and
16          3.     Protect the image of the Organic Division and the Corporation as members of the
            business community recognizing their responsibilities to prevent and/or con-
17          trol contamination of the global ecosystem.[34]

18          64.       An interoffice memorandum circulated on February 16, 1970, provided talking points

19   for discussions with customers in response to Monsanto's decision to eliminate Aroclors 1254 and

20   1260:  "We (your customer and Monsanto) are not interested in using a product which may present a

21   problem to our environment."  Nevertheless, the memo acknowledges that Monsanto "can't afford to

22   lose one dollar of business."  To that end, it says, "We want to avoid any situation where a customer

23   wants to return fluid. . . .  We would prefer that the customer use up his current inventory and purchase

24   [new products] when available.  He will then top off with the new fluid and eventually all Aroclor

25   1254 and Aroclor 1260 will be out of his system.  <u>We don't want to take fluid back</u>." [35]

26   —————————————————

27   [33] DSW 014612-014624, at 014615, attached as Exhibit M.
     [34] *Id.*
28   [35] MONS 100123-100124, attached as Exhibit N.

PLAINTIFF'S ORIGINAL COMPLAINT

65.     In 1970, the year after Monsanto formed the "ad hoc" committee, and despite Monsanto's knowledge of the global reach of PCB contamination, PCB production in the United States peaked at 85 million pounds.

66.     Growing awareness of the ubiquitous nature of PCBs led the Unites States to conduct an investigation of health and environmental effects and contamination of food and other products.  An interdepartmental task force concluded in May 1972 that PCBs were highly persistent, could bioaccumulate to relatively high levels, and could have serious adverse health effects on human health.[36]

67.     After that report, environmental sampling and studies indicated that PCBs were a "more serious and continuing environmental and health threat than had been originally realized."[37]  To address these concerns, EPA undertook a study to assess PCB levels in the environment on a national basis.  That study revealed widespread occurrence of PCBs in bottom sediments in several states, including California;  in fish and birds;  in lakes and rivers;  in the Atlantic Ocean, the Pacific Ocean, and the Gulf of Mexico; sewage treatment facilities;  in a variety of foods including milk, poultry, eggs, fish, meat, and grains; and in human tissues, blood, hair, and milk.[38]

68.     EPA's study noted the particular burden on California.  "PCBs have become a significant component of the marine food webs of southern California," were found in sediments in the Santa Barbara Basin, and found in high levels in the San Francisco Bay.[39]

69.     At the same time, Monsanto was promoting the use and sale of Aroclor and other PCB compounds.  In a 1960 brochure, Monsanto promotes the use of Aroclors in transformers and capacitors, utility transmission lines, home appliances, electric motors, fluorescent light ballasts, wire or cable coatings, impregnants for insulation, dielectric sealants, chemical processing vessels, food cookers, potato chip fryers, drying ovens, thermostats,  furnaces, and vacuum diffusion pumps. Aroclors could also be used, the brochure advertised, as a component of automotive transmission oil;

---

[36] EPA, Review of PCB Levels in the Environment, EPA-560/7-76-001 (January 1976).
[37] *Id*. at 1.
[38] *Id*., *passim*.
[39] *Id*.

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT

1  insecticides; natural waxes used in dental casting, aircraft parts, and jewelry; abrasives; specialized

2  lubricants; industrial cutting oils; adhesives; moisture-proof coatings; printing inks; papers; mastics;

3  sealant; caulking compounds; tack coatings; plasticizers; resin; asphalt; paints, varnishes, and lacquers;

4  masonry coatings for swimming pools, stucco homes, and highway paints;  protective and decorative

5  coatings for steel structures, railway tank and gondola cars; wood and metal maritime equipment;  and

6  coatings for chemical plants, boats, and highway marking. [40]

7      70.      A 1961 brochure explains that Monsanto's Aroclors are being used in "lacquers for

8  women's shoes,"   as "a wax for the flame proofing of Christmas trees,"  as "floor wax,"  as an

9  adhesive for bookbinding, leather, and shoes,  and as invisible marking ink used to make chenille rugs

10  and spreads. [41]

11      71.      Thus, by February 1961, at the latest, Monsanto knew that its Aroclors were being used

12  in a variety of industrial, commercial, household, and consumer goods.  Moreover, Monsanto

13  affirmatively encouraged these uses by encouraging salesmen to market products for these and other

14  applications.

15      72.      A few years later, in 1970, Monsanto tried to distance itself from the variety of

16  applications of Aroclors that it proudly espoused a few years before.  In a press release, the company

17  claimed:  " 'What should be emphasized . . . is that PCB was developed over 40 years ago primarily

18  for use as a coolant in electrical transformers and capacitors.  It is also used in commercial heating and

19  cooling systems.  It is not a 'household' item.'"[42]

20          **D.      Monsanto Concealed the Nature of PCBs from Governmental Entities.**

21      73.      While the scientific community and Monsanto knew that PCBs were toxic and

22  becoming a global contaminant, Monsanto repeatedly misrepresented these facts, telling governmental

23  entities the exact opposite — that the compounds were not toxic and that the company would <u>not</u>

24  expect to find PCBs in the environment in a widespread manner.[43]

25

26  [40] The Aroclor Compounds (hand dated May 1960), 0509822- 66, attached as Exhibit S.

27  [41] Plasticizer Patter (February 1961), 0627503-21, attached as Exhibit T.
[42] *See* Press release (July 16, 1970), MCL000647-50, attached as Exhibit U, at MCL000648.

28  [43] See Exhibits O-R (letters to governmental agencies).

PLAINTIFF'S ORIGINAL COMPLAINT

74.     In a March 24, 1969 letter to Los Angeles County Air Pollution Control District, Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or skin absorption."[44]  Addressing reports of PCBs found along the West Coast, Monsanto claimed ignorance as to their origin, explaining that "very little [Aroclor] would normally be expected either in the air or in the liquid discharges from a using industry."[45]  A similar letter to the Regional Water Quality Control Board explained that PCBs are associated with "no special health problems" and "no problems associated with the environment."[46]

75.     In May, 1969, Monsanto employee Elmer Wheeler spoke with a representative of the National Air Pollution Control Administration, who promised to relay to Congress the message that Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread fashion."[47]

76.     Monsanto delivered the same message to the New Jersey Department of Conservation in July, 1969, claiming first, "Based on available data, manufacturing and use experience, we do not believe the PCBs to be seriously toxic."[48]  The letter then reiterates Monsanto's position regarding environmental contamination:  "We are unable at this time to conceive of how the PCBs can become wide spread in the environment. It is certain that no applications to our knowledge have been made where the PCBs would be broadcast in the same fashion as the chlorinated hydrocarbon pesticides have been."[49]

///

///

///

_____

[44] Letter from Monsanto to Los Angeles County Air Pollution Control District (March 24, 1969), attached as Exhibit O.
[45] Id.
[46] Letter from Monsanto to State of California Resources Agency (March 27, 1969), attached as Exhibit P.
[47] Monsanto Memorandum to W.R. Richard (May 26, 1969), attached as Exhibit Q.
[48] Letter from Monsanto to Department of Conservation and Economic Development (July 23, 1969), attached as Exhibit R.
[49] Id.

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT

# FIRST CAUSE OF ACTION

## PUBLIC NUISANCE

77.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

78.     Monsanto manufactured, distributed, marketed, and promoted PCBs in a manner that created or participated in creating a public nuisance that is harmful to health and obstructs the free use of the Bay.

79.     The presence of PCBs interferes with the comfortable enjoyment of the Bay for customary uses for fishing, swimming, and other water activities.

80.     The presence of PCBs interferes with the free use of the Bay for the promotion of commerce, navigation, and fisheries.

81.     The presence of PCBs interferes with the free use of the Bay for ecological preservation and habitat restoration.

82.     The San Francisco Bay Regional Water Quality Control Board, pursuant to the NPDES under the Clean Water Act, requires the Plaintiff to reduce their discharge of PCBs into the Bay to prevent further contamination of the already impaired body of water.

83.     The presence of PCBs causes inconvenience and annoyance to Plaintiff, who is charged with reducing the PCB discharge toward TMDL levels, in order to protect plant and animal life, and the quality of water in the bay.

84.     The condition affects a substantial number of people who use the Bay for commercial and recreational purposes and interferes with the rights of the public at large to clean and safe resources and environment.

85.     An ordinary person would be reasonably annoyed or disturbed by the presence of toxic PCBs that endanger the health of fish, animals, and humans and degrade water quality and destroy marine habitats.

86.     The seriousness of the environmental and human health risk far outweighs any social utility of Monsanto's conduct in manufacturing PCBs and concealing the dangers posed to human health and the environment.

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT

87.     The Plaintiff has suffered and will continue to harm that is different from the type of harm suffered by the general public, and the Plaintiff has incurred substantial costs deriving from state-mandated PCB TMDLs.

88.     Plaintiff did not consent to the conduct that resulted in the contamination of the Bay.

89.     Monsanto's conduct was a substantial factor in causing the harm to the Plaintiff.

90.     Monsanto knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PCBs was causing the type of contamination now found in the Bay. Monsanto knew that PCBs would contaminate water supplies, would degrade marine habitats, would kill fish species, and would endanger birds and animals. In addition, Monsanto knew that PCBs are associated with serious illnesses and cancers in humans and that humans may be exposed to PCBs through ingestion and dermal contact. As a result, it was foreseeable to Monsanto that humans may be exposed to PCBs through swimming in contaminated waters or by eating fish from those waters. Monsanto thus knew, or should have known, that PCB contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of any coastal marine areas.

91.     As a direct and proximate result of Monsanto's creation of a public nuisance, Plaintiff has suffered, and continues to suffer, monetary damages to be proven at trial.

## SECOND CAUSE OF ACTION

### EQUITABLE INDEMNITY

92.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

93.     Monsanto is responsible for creating the public nuisance by manufacturing, distributing, and promoting PCBs, resulting in contamination in and around the Bay.

94.     Monsanto's creation of the public nuisance contributed as a substantial factor in causing Plaintiff's injury and damages.

95.     The conduct of Plaintiff did not contribute in any way to the creation of the public nuisance.

///

///

GOMEZ
TRIAL ATTORNEYS

## **PRAYER FOR RELIEF**

Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1.  Compensatory damages according to proof;

2.  Punitive damages;

3.  Litigation costs and attorney's fees as provided by law;

4.  Pre-judgment and post-judgment interest;

5.  Any other and further relief as the Court deems just, proper, and equitable.


## **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial.


Dated:  July 8, 2015                    By: s/ John P. Fiske

**GOMEZ TRIAL ATTORNEYS**
John H. Gomez (SBN 171485)
John P. Fiske (SBN 249256)
655 West Broadway, Suite 1700
San Diego, California 92101

**BARON & BUDD, P.C.**
Scott Summy (pending Pro Hac Vice)
Carla Burke (pending Pro Hac Vice)
Celeste Evangelisti (SBN 225232)
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219-4281

**OFFICE OF THE CITY ATTORNEY**
**City of San Jose**
Richard Doyle (SBN 88625)
Nora Frimann (SBN 93249)
200 E Santa Clara St
San Jose, CA 95113-1905